# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs May 1, 2012

## STATE OF TENNESSEE v. MARLO DAVIS

**Appeal from the Criminal Court for Shelby County**
**No. 07-01813    W. Mark Ward, Judge**

**No. W2011-01548-CCA-R3-CD  - Filed May 21, 2013**

The Defendant, Marlo Davis, was convicted by a Shelby County jury of second degree murder and reckless homicide.  Subsequently, the trial court merged the reckless homicide into the second degree murder conviction and imposed a sentence of forty years.  In this direct appeal, the Defendant challenges (1) the sufficiency of the evidence supporting his convictions; (2) the mutually exclusive nature of the verdicts and whether the offenses were properly merged; (3) the admission of prior inconsistent statements by a witness, who had no memory of making those statements at the time of trial, as substantive evidence; (4) the imposition of the maximum forty-year sentence in violation of Blakely v. Washington, 542 U.S. 296 (2004); and (5) the cumulative effect of these errors.  After a thorough review of the record and the applicable authorities, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and CAMILLE R. MCMULLEN, JJ., joined.

C. Anne Tipton, Memphis, Tennessee, for the appellant, Marlo Davis.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Amy P. Weirich, District Attorney General; and David Michael Zak, Jr., Stephanie Zander Johnson, and Robert William Ratton, III, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### FACTUAL BACKGROUND

This case arises from the November 9, 2006 shooting death of Quincy Jones, the victim, for which the Defendant and Latarius Sawyer, his co-defendant, were indicted for

first degree premeditated murder and first degree felony murder. A joint trial was held in April 2011.

On the date in question, November 9, 2006, the victim was refurbishing one of his rental properties located on the corner of Ely and Essex Streets in Memphis. He drove a Range Rover, which was parked behind the property at the time of the shooting. He died from a gunshot wound to the abdomen.

Laraine Bobo lived diagonally across the street from the victim's rental property. Ms. Bobo testified that, between 3:00 and 3:15 p.m. that day, she was sitting in her driveway waiting for her grandchildren, Jarcquise and Melnitra Spencer,[1] and nephews, David and Demetrius Holloway,[2] to come home from school. As she was waiting, Ms. Bobo observed Clarence "Dusty" Bailey knock on the victim's front door. According to Ms. Bobo, Bailey left when no one answered the door.

Sometime thereafter, Ms. Bobo saw the co-defendant, whom she recognized, standing outside the church located across the street from her house and the victim's house. According to Ms. Bobo, the co-defendant was standing next to a telephone pole with another person, but she could not see the other person's face because he was wearing a jacket with the hood pulled up.

Ms. Bobo testified that she saw Spencer and Holloway, who were ten years old at the time of the shooting, walking together down the street towards her house. As the children were walking, Ms. Bobo heard some people arguing, and although she could not see the argument, she became fearful and yelled at the children to run home. She heard a gunshot as the children were running. After getting the children safely inside, Ms. Bobo saw the victim walking towards her house. Ms. Bobo went to assist the victim, who had been shot in the stomach, and telephoned 9-1-1. She held a towel on the wound, but by the time officers arrived on the scene, the victim was unresponsive.

Ms. Bobo later identified the co-defendant and Bailey from photographic displays. She also gave multiple statements to the police.

Camry Richardson, age fifteen at the time of the shooting, was walking her cousin home from school that day sometime between 3:15 and 3:20 p.m when she saw the victim

---

[1] References in this opinion to "Spencer" are intended to refer to Jarcquise Spencer, not his sister Melnitra.

[2] References in this opinion to "Holloway" are intended to refer to Demetrius Holloway, not his brother David.

speaking with two African-American males. One of the men was wearing a hooded jacket. She could not identify either of them. Richardson was walking towards her house when she heard a gunshot. She saw the victim hunched over and holding his stomach; the other two men were running into an alleyway or shortcut of some kind leading to Miller Street.

Ella Renee Conyers testified that she shared a parking area with the victim behind their respective homes. On November 9, 2006, she was driving down Essex Street towards her house on Miller Street. As she stopped at the stop sign on the corner of Ely and Essex Streets, she observed a man looking in the front door of the victim's property. She continued to drive and saw a second man crouched behind another vehicle belonging to her and parked at her residence. According to Conyers, the man, realizing she was looking at him, stood up. She did not recognize him. She then parked off Miller Street in front of her house and saw a third man across the street from the church. Conyers said this man was watching her as she parked her car. He was taller than the man crouched behind her vehicle and was of medium build. She opined that both men were over eighteen years of age. After parking her vehicle, Conyers first went inside to check on her dog and then was going to check on the other vehicle when she heard a gunshot. She went outside and learned that the victim had been shot.

Demetrius Holloway, who was fifteen years old at the time of trial, testified that he was walking home from school with family members on November 9, 2006. As he was walking with his cousin Spencer, he saw two men sitting beside the church across the street from his aunt's house. According to Holloway, Spencer briefly shook hands with the men before they continued on their route home. Holloway did not know the two men but observed that one of the men was wearing a hooded sweatshirt. As they were walking, Holloway saw the two men walk across the street to a third man, and the three of them began to argue. Holloway testified that he saw the man wearing the hooded sweatshirt pull out a gun and that, as he was running to his aunt's house, he heard a gunshot. Holloway said the third man, who had been shot, then ran to his aunt's driveway, holding his stomach, and thereafter collapsed. Holloway testified that he did not see where the two men went after the shooting.

Clarence Bailey[3] testified that around 2:30 or 3:00 p.m. on November 9, 2006, he was walking on Essex Street towards Ely Street looking for some work to do. Bailey admitted

---

[3] At the time of the Defendant's trial, Bailey was incarcerated in the State of Texas, serving a sentence of life without parole for first degree murder. The parties stipulated that Bailey was unavailable under Tennessee Rule of Evidence 804(a)(5) and Tennessee Rule of Criminal Procedure 15(h)(1)(e) and admitted his in-court, videotaped testimony. At the time of that testimony, Bailey was incarcerated in the State of Tennessee for domestic assault and aggravated burglary.

that he was addicted to cocaine and seeking money to purchase more cocaine. He further admitted that he had been using cocaine earlier that day.

As Bailey was walking, he encountered the Defendant and co-defendant on the sidewalk, both of whom he had known since they were children. Bailey recalled that the Defendant was wearing a hooded, pullover jacket, but he could not remember if the Defendant had the hood up over his head. After exchanging greetings with the two men, Bailey continued walking through the neighborhood.

Bailey saw the victim's property and went and knocked on the front door. No one answered. He left. After turning the corner onto Essex Street, Bailey saw a white car drive past him, traveling at a slow rate of speed. According to Bailey, the driver was watching something to the left before turning and looking at Bailey "dead in [his] face." As he continued walking down Essex Street, Bailey saw the Defendant crouched behind the victim's Range Rover and the co-defendant crouched behind the car parked next to the Range Rover. Bailey kept walking and then heard a gunshot. He turned around to see what was going on and saw the co-defendant walk from behind the car in the direction of the commotion. Bailey then ran.

Bailey later gave two statements to the police. According to Bailey, he was truthful in both statements but omitted some information in the first statement because he was reluctant to get involved. Bailey identified the Defendant from a photographic display as "one of the guys . . . stooped behind the truck." He also identified the co-defendant. Bailey said that his police statements were consistent with his testimony.

Jarcquise Spencer, who was fifteen years old at the time of trial, testified that he had little recollection of the events of November 9, 2006, recalling only that the victim collapsed in his grandmother's front yard and getting a towel to stop the bleeding. He further did not remember giving a statement to the police, viewing photographic displays, or testifying at the preliminary hearing in this matter.

The recording of his statement was played in-court, and Spencer still could not remember any of the details surround his testimony at that hearing. He was able to confirm that it was his voice on the recording. The recording was admitted as an exhibit.

Spencer also examined his statement taken by Sergeant Anthony Mullins at the police station several days after the shooting; however, such examination was unhelpful in refreshing Spencer's recollection about the contents of the statement or the events of the shooting. Spencer was able to identify his signature at the bottom of the statement next to

-4-

his mother's.[4]  His statement was then read for the jury.  In the statement, Spencer identified the Defendant as the shooter and stated that the Defendant was accompanied by his co-defendant during the shooting.  When asked if the Defendant said anything to the victim before firing upon him, Spencer said the following:

> Spencer:  No, sir.  I mean he was like, "Give it to me!"
> Sgt. Mullins:  Did [the victim] say anything to [the Defendant]?
> Spencer:  Yes.  He said, "No, don't do me like this!" and he had his arms raised up (indicates this with both hands raised in a gesture of surrender or compliance).
> Sgt. Mullins:  Did [the co-defendant] say anything to [the victim] or to [the Defendant]?
> Spencer:  No.  He was just standing beside [the Defendant].

Spencer also told Sgt. Mullins that the Defendant was wearing a hooded sweatshirt with the hood up but that he could still see his face.

Sgt. Mullins also asked Spencer about previously viewing several photographic displays and preparing a sketch of the scene in the statement.  Spencer confirmed that Sgt. Mullins had previously interviewed him at his grandmother's house and that he had positively identified several individuals from photographic displays at that time.  Additionally, Spencer confirmed that, in this prior interview, he had also identified the locations of various individuals on a crime scene diagram prepared by Sgt. Mullins.  The statement was admitted as an exhibit.

At trial, Spencer was also shown the four photographic displays he reviewed with Sgt. Mullins just following the shooting; however, Spencer could not remember identifying anyone in those displays by the time of trial.  Spencer's signature appeared on the "Advice to Witness Viewing Photographic Display" form, along with his initials and handwritten notations of positive identifications in the displays.  Moreover, Spencer confirmed that his initials and handwriting appeared on the displays; the displays were also signed and dated with a time notation.  In the displays, Spencer identified Bailey as the man he saw walking; the Defendant as the man who pointed the gun at the victim; and the co-defendant as the man accompanying the Defendant.  The advice form and displays were admitted as exhibits.

---

[4]  There is some indication in the record that this statement was handwritten by Spencer; however, the copy in the record appears as a typed statement, prepared by Sgt. Mullins.  The pages are initialed by both Spencer and his mother and both of their signatures appear on the last page of document.

Additionally, the crime scene diagram, wherein Spencer identified his, the victim's, the Defendant's, the co-defendant's, and Bailey's locale at the time of the shooting, was admitted as an exhibit. Spencer's signature appeared on the diagram, but at trial, he did not recall the sketch.

Neither the Defendant nor his co-defendant presented any proof.

Based upon the foregoing, the jury found the Defendant guilty of the lesser-included offense of second degree murder, as charged under the felony murder count (Count 1), and reckless homicide, as charged under the premeditated count (2).[5] The trial court merged the reckless homicide into the second degree murder conviction and imposed a sentence of forty years. This appeal followed.

## ANALYSIS

On appeal, the Defendant raises the following issues for our review: (1) whether the evidence was sufficient to support his convictions; (2) whether the verdicts rendered were mutually exclusive and merged in violation of his double jeopardy rights; (3) whether the trial court properly admitted Spencer's prior inconsistent statements, who had no memory of making those statements at the time of trial, as substantive evidence; (4) whether imposition of the maximum sentence violated his constitutional right to a trial by jury; and (5) whether the cumulative effect of these errors deprived him of a fair trial.[6] We address each in turn.

### I. Sufficiency of the Evidence

The Defendant has challenged, among other issues, the sufficiency of the evidence supporting his conviction for second degree murder and reckless homicide. Specifically, the Defendant cites to State v. Untwon Bishop, No. 02C01-9508-CC-00243, 1997 WL 122246 (Tenn. Crim. App. Mar. 19, 1997), and makes the following argument attacking the sufficiency of the evidence supporting his convictions:

> Although factual determination [sic] are made by the jury, there are instances where the unreliability of a verdict is so overwhelming that the reviewing court must overrule the jury's findings in order to mete out fairness and justice. . . .

---

[5] The co-defendant was found not guilty on both counts.

[6] For the purpose of clarity, we have renumbered and reordered the issues as stated by the Defendant in his brief.

In this instance overwhelming unreliability of the hearsay testimony of the State's primary witness, Mr. Spencer, the testimony of convicted murdered [sic] Mr. Bailey and the reluctant, inconsistent and untimely revelation of witness Mr. Holloway are demonstrated in the mutually exclusive verdicts returned by the jury. As set forth in Bishop[7] the appellate court must overrule the jury's findings.

The State responds that the Defendant's attack on "the credibility of these witnesses cannot be the basis for challenging his convictions. The jury heard the testimonies of these witnesses and resolved any inconsistencies in their respective testimonies against the [D]efendant by founding [sic] him guilty of second degree murder and reckless homicide."

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on

---

[7] The Bishop court relied upon the previous standard of State v. Crawford, which required the State to prove facts and circumstances "so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." 470 S.W.2d 610, 612 (Tenn. 1971). In State v. Dorantes, 331 S.W.3d 370 (Tenn. 2011), our supreme court overruled Crawford and held that circumstantial evidence should be treated the same as direct evidence when determining the legal sufficiency of the evidence.

appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

As lesser-included offense of first degree felony murder in Count 1, the jury convicted the Defendant of second degree murder. Second degree murder is defined as the knowing killing of a victim. See Tenn. Code Ann. § 39-13-210(a)(1). Our supreme court has determined that second degree murder is a result-of-conduct offense. See State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). Accordingly, "[a] person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). In Count 2, as a lesser-included offense of first degree premeditated murder, the Defendant was found guilty of reckless homicide. Our criminal code defines reckless homicide as the "reckless killing of another," see Tennessee Code Annotated section 39-13-215(a), and provides that

> "[r]eckless" refers to a person who acts recklessly with respect to . . . the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that . . . the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-302(c).[8]

First, we address the Defendant's issues of Spencer's hearsay statements and of possible, mutually exclusive verdicts in later sections of this opinion, concluding that these issues are without merit. Moreover, regarding Holloway's "revelation," the jury heard testimony that Holloway did not initially come forward as an eyewitness to the crime and was not interviewed until 2011 by the prosecution. The Defendant's attack on the sufficiency of the evidence is essentially an argument as to the credibility of the witnesses and assertions that conflicts in the proof must be construed in favor of Defendant. Of course this argument must fail in light of the well established law set forth above.

Taken in the light most favorable to the State, the evidence at trial showed that Holloway and Spencer were walking home from school on November 9, 2006. They encountered the Defendant and co-defendant, and Spencer greeted them briefly. As the

---

[8] Like second degree murder, reckless homicide is a result-of-conduct offense. See Ducker, 27 S.W.3d at 896 (recognizing that result-of-conduct offenses focus on whether the accused "possessed the required culpability to effectuate the result" proscribed by the offense).

children continued on their walk home, the Defendant and co-defendant crossed the street and approached the victim. The victim was refurbishing his rental property at the time. An altercation between the men ensued, including a demand by the Defendant for something from the victim. The Defendant then shot the victim in the abdomen at close range, which obviously was likely to cause the victim's death. Therefore, we conclude that the proof was sufficient to sustain the Defendant's second degree murder and reckless homicide convictions. After review, we conclude that the evidence, taken together, established the element of the knowledge and the lesser mens rea of reckless; therefore, the evidence was sufficient to support the Defendant's convictions for second degree murder and reckless homicide.

*II. Mutually Exclusive Verdicts*

While we have concluded that the evidence is sufficient to support the merged convictions, we must next address the Defendant's argument of mutually exclusive verdicts. He argued the issue at the motion for new trial hearing. The trial court agreed that the verdicts were inconsistent but noted that the law did not prevent inconsistent verdicts. The trial court further determined that it had merged the offenses "correctly."

On appeal, the Defendant contends that the trial court violated his "right against double jeopardy when it failed to merge the jury verdict of second degree murder into the conviction of reckless homicide in light of the mutually exclusive verdicts[.]" Stated another way, the Defendant is arguing that the verdicts are mutually exclusive because a guilty verdict for reckless homicide on the premeditated murder count logically excludes a finding of guilt for second degree murder on the felony murder count. The Defendant submits that the proper remedy for mutually exclusive verdicts is to merge the offenses into the lesser conviction, here reckless homicide, rather than the greater offense of second degree murder as the trial court so ordered. The State responds that trial court properly merged the reckless homicide conviction into the second degree murder conviction, thereby alleviating any double jeopardy concerns.

As the Defendant notes, the case law on the doctrine of mutually exclusive verdicts in Tennessee is sparse, having only been discussed by this court in two unreported decisions: State v. Chris Jones, No. W2009-01698-CCA-R3-CD, 2011 WL 856375 (Tenn. Crim. App. Mar. 9, 2011), perm. app. denied, (Tenn. Aug. 25, 2011), and State v. James Snipes, No. W2011-02161-CCA-R3-CD, 2013 WL 1557367 (Tenn. Apr. 12, 2013). Jones was the first case in this State to discuss the applicability of the mutually exclusive verdict doctrine, and Snipes cited to the analysis therein. In Jones, the defendant was convicted of the second degree murder of one victim, the attempted second degree of another victim, and the attempted voluntary manslaughter of yet another victim, and he argued on appeal to this court

that the verdicts were mutually exclusive. On appeal, this court first stated that the doctrine had never before been addressed in this State and then referred to a case from the Supreme Court of Georgia that distinguished between verdicts that are merely inconsistent and ones that are mutually exclusive when a defendant is convicted of multiple crimes:

> Mutually exclusive verdicts exist when "a guilty verdict on one count logically excludes a finding of guilty on the other." Jackson v. State, 577 S.E.2d 570, 573 (Ga. 2003) (quoting United States v. Powell, 469 U.S. 57, 69 n.8 (1984)). When two verdicts are mutually exclusive, the jury, "in order to find the defendant guilty on both counts, necessarily reached two positive findings of fact that cannot logically mutually exist." Id. at 574 (internal quotation marks omitted). For example, when a jury convicts a defendant on two counts arising from the same act and one count requires proof that the defendant acted negligently and the other count requires proof that the defendant acted intentionally the verdicts are considered to be mutually exclusive. Id. at 575. In contrast, inconsistent verdicts exist when the jury convicts a defendant of one offense and acquits the defendant on another offense even though "both counts stem from the same criminal transaction." Wiggins[ v. State], 498 S.W.2d [92,] 94 [(Tenn. 1973)]. It has long been held that appellate courts will not disturb seemingly inconsistent verdicts because doing so would require inappropriate speculation as to the jury's reasoning and because each count in a multiple count indictment is treated as a separate indictment. Id. at 93-94.
>
> The key difference between the two doctrines is that mutually exclusive verdicts involve two positive findings of fact, whereas inconsistent verdicts involve one positive finding of fact and "the failure to make a positive finding of fact as to the other." Jackson, 577 S.E.2d at 574 n.3. . . . "The rule against mutually exclusive verdicts applies only where the convictions result from the same act involving the same victim at the same instant." Waits v. State, 644 S.E.2d 127, 130 (Ga. 2007).

Jones, 2011 WL 856375, at *10. The Jones court then agreed with the defendant that his case involved a situation where the jury made positive findings of fact regarding each of the first three counts of the indictment. However, the court then concluded that, "even if the doctrine of mutually exclusive verdicts were to apply in Tennessee," it did not apply under the facts presented therein because the defendant's convictions were "the result of three different acts, against three different victims, and, while occurring in rapid succession, that occurred at three different times." Id. (emphasis added). Likewise, the court in Snipes concluded that the doctrine did not apply in that case where the defendant was convicted of

-10-

felony murder during the commission of an aggravated burglary but acquitted on the aggravated burglary count, convicted instead of the lesser-included offense of aggravated criminal trespass of a habitation. 2013 WL 1557367, at * 8-9.

Contrary to the Defendant's argument, we did not adopt the mutually exclusive doctrine in the Jones case; instead, we simply noted that, if applicable in this State, the doctrine did not apply in that case. However, in the instant case, the jury would have had to find that the Defendant simultaneously acted both knowingly and recklessly with regard to the same act and the same result, i.e., the death of the victim. Thus, we must determine under what circumstances the jury may not convict of two distinct offenses arising out of the same factual situation, if any such situation exists at all in the State of Tennessee. We begin our analysis by examining United States Supreme Court's jurisprudence on the subject.

The principle that inconsistent verdicts are permitted as long as there is sufficient evidence to permit a rational fact finder to find a defendant's guilt beyond a reasonable doubt on the charges on which the defendant was convicted was first enunciated by the United States Supreme Court in Dunn v. United States, 284 U.S. 390 (1932), overruled on other grounds by Sealfon v. United States, 332 U.S. 575 (1948). In Dunn, the defendant was found guilty of maintaining a common nuisance by keeping intoxicating liquor for sale at a specified place but acquitted of the offenses of possession and sale of intoxicating liquors, even though the evidence was the same for all counts. The defendant challenged the inconsistency of the verdicts, arguing that the jury's finding that he did not unlawfully sell or possess liquor necessarily negated a finding that he committed the nuisance offense. In upholding the defendant's nuisance conviction, the Supreme Court observed as follows:

> The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right exercise, but to which they were disposed through lenity.
>
> That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters.

Id. at 393-94 (quotation and citation omitted). The Court declined to disturb the defendant's nuisance conviction, observing that "[e]ach count in an indictment is regarded as if it was a separate indictment," reasoning that had separate indictments been returned and the cases

been separately tried, an acquittal on one could not be pleaded as res judicata of the other even though the same evidence was offered in support of each indictment at trial. Id. at 393.

In United States v. Powell, 469 U.S. 57 (1984), the Court noted that, although the res judicata element of Dunn could no longer be accepted, "the Dunn rule rests on a sound rationale that is independent of its theories of res judicata, and that it therefore survives an attack based upon its presently erroneous reliance on such theories." 469 U.S. at 64. The "alternative rationale" of Dunn—that such inconsistencies often are a product of jury lenity—continues to reflect a "recognition of the jury's historic function, in criminal trials, as a check against arbitrary or oppressive exercises of power by the Executive Branch." Id. at 65. As the Dunn Court noted, where truly inconsistent verdicts have been reached, "[t]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt." 284 U.S. at 393. The rule in Dunn, the Powell Court stated, has stood without exception for fifty-three years and should remain that way. 469 U.S. at 69.

In so holding, the Powell Court reasoned that the rule espoused in Dunn embodied "a prudent acknowledgment of a number of factors." Id. at 65. First, inconsistent verdicts should not necessarily be interpreted as a windfall to the prosecution at the defendant's expense because the jury may have "properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense." Id. Of course, the prosecution has no recourse to correct the jury's error under such circumstances, the government being precluded from challenging the acquittal by the double jeopardy clause. Id. (citations omitted). Therefore, the inconsistent verdicts "present a situation where 'error,' in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is unclear whose ox has been gored." Id. "Given this uncertainty, and the fact that the Government is precluded from challenging the acquittal, it is hardly satisfactory to allow the defendant to receive a new trial on the conviction as a matter of course" and such is not required by the Constitution. Id. (citing Harris v. Rivera, 454 U.S. 339 (1981)). Therefore, according to the Court in Powell, "the possibility that the inconsistent verdicts may favor the criminal defendant as well as the Government militates against review of such convictions at the defendant's behest."

Second, any attempt to separate a verdict that may be the product of an error that worked against one of the parties would be based on pure speculation or would involve inappropriate inquiry into the jury's deliberations. Id. at 66. The Powell court rejected, "as imprudent and unworkable, a rule that would allow criminal defendants to challenge inconsistent verdicts" in the event the inconsistency worked to their disadvantage. Id. at 67. "Such an individualized assessment of the reason for the inconsistency would be based either

on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake." Id. Although jurors are charged to follow the law as instructed, once the evidence is presented and the case submitted to the jurors, "the litigants must accept the jury's collective judgment." Id. "Courts have always resisted inquiring into a jury's thought processes[.]" Id. (citation omitted).

Third, a criminal defendant is already protected against jury irrationality or error by independent review of the sufficiency of the evidence by the trial and appellate courts. Id. at 67. The Powell Court held that further safeguards against jury irrationality were unnecessary. Id.

Turning to Tennessee jurisprudence, this issue in the instant case is not, strictly speaking, a case of first impression. Our courts have spoken on the subject, although not in terms of mutually exclusivity as posited by the Defendant, in prior cases. In Wiggins v. State, 498 S.W.2d 92 (Tenn. 1973), our Supreme court adopted the analysis of the United States Supreme Court in Dunn and held that "consistency in verdicts for multiple count indictments is unnecessary as each count is a separate indictment" and must be individually supported by the evidence. 498 S.W.2d at 94-95. The court reasoned,

> An acquittal on one count cannot be considered res judicata to another count even though both counts stem from the same criminal transaction. This [c]ourt will not upset a seemingly inconsistent verdict by speculating as to the jury's reasoning if we are satisfied that the evidence establishes guilt of the offense upon which the conviction was returned.

Id. at 95.

Following Wiggins, this court has consistently declined to disturb one conviction on the basis that the jury's acquittal on another offense is inconsistent, even when the elements and evidence of the two offenses intertwine or are the same. In State v. Derek T. Payne, No. W2001-00532-CCA-R3-CD, 2002 WL 31624813 (Tenn. Crim. App. Nov. 20, 2002), for example, this court upheld a defendant's conviction for second degree murder as a lesser-included offense of felony murder even though the jury convicted the defendant of the underlying felony. In State v. Tony Scott Walker, No. 02C01-9704-CC-00147, 1997 WL 746433 (Tenn. Crim. App. Dec. 3, 1997), the defendant was convicted of first degree felony murder but was acquitted of the underlying felony of especially aggravated robbery. Despite the inconsistencies presented by the two verdicts, this court upheld the defendant's conviction for felony murder under the principles set forth in Wiggins and Powell. Walker, 1997 WL 746433, at *5; see also Snipes, 2013 1557367, at *8-9; State v. Michael Shane Grogger, No. M2008-02015-CCA-R3-CD, 2009 WL 3832921, at *14 (Tenn. Crim. App.

Nov. 17, 2009) (conviction for felony murder upheld even though acquitted of underlying felony). In so doing, this court observed that "any attempt to separate a verdict that may be the product of an error that worked against one of the parties would be based on pure speculation or would involve inappropriate inquiry into the jury's deliberation." Walker, 1997 WL 746433, at *4 (citing Powell, 469 U.S. at 66). Thus, this court's only inquiry when presented with inconsistent verdicts is the sufficiency of the evidence of the convicted offenses. Id. at *5; see Wiggins, 498 S.W.2d at 93. Recently, this court in State v. Shelly Minor, W2010-01677-CCA-R3-CD, 2012 WL 3055776 (Tenn. Crim. App. July 26, 2012), perm. app. denied, (Tenn. Jan. 22, 2013), affirmed a defendant's convictions for second degree murder and leaving the scene of an accident involving injury or death as a lesser-included offense of leaving the scene of an accident resulting in death. On appeal, the defendant claimed that the verdicts were inconsistent, arguing that "the jury 'flatly rejected this notion that [the defendant] knew or reasonably should have known that [the victim's] death resulted from the accident.'" 2012 WL 3055776, at *14. We rejected that argument, reasoning that each count of an indictment is regarded as a separate offense. Id.

In a case strikingly similar to the factual scenario before us, State v. Manolito Jemison, No. M1999-00752-CCA-R3-CD, 2000 WL 1731288 (Tenn. Crim. App. Nov. 22, 2000), the defendant was charged with one count of first degree premeditated murder, one count of first degree felony murder, and a separate charge for the underlying felony of aggravated assault. The trial court later granted the Defendant's motion for judgment of acquittal on the assault charge. Subsequently, the jury found the defendant guilty of voluntary manslaughter and reckless homicide. The two verdicts, one for voluntary manslaughter as found in the premeditated murder count and one for reckless homicide as found in the felony murder count, were merged into one conviction for voluntary manslaughter. At the hearing on the defendant's motion for a new trial, the defendant argued that the verdicts were inconsistent. Although not specifically raised as an issue on appeal, this court declined to the disturb the verdicts, noting that "'[i]nconsistent verdicts are permitted as long as there is sufficient evidence to permit a rational fact finder to find a defendant's guilt beyond a reasonable doubt on the charges on which the defendant was convicted.'" Jemison, 2000 WL 1731288, at *4 n.3 (quoting Walker, 1997 WL 746433, at *3.) The court then turned to a review of the sufficiency of the evidence of the voluntary manslaughter conviction. Id.

In states that do apply the mutually exclusive doctrine, the error rests on the trial court's improper charge to the jury. For example, in the Jackson case, the error noted by the Supreme Court of Georgia was that, "rather than instructing the jury not to return a mutually exclusive verdict, the jury . . . was expressly charged that it could render a verdict of guilty on every count in the indictment." 577 S.E.2d at 573 (footnote omitted). No instruction of

-14-

that type has ever been required in this State,[9] and based upon our current jurisprudence, we decline to hold that such an instruction is merited now.

We have already concluded that the evidence is sufficient to support the Defendant's convictions for second degree murder and reckless homicide. The Defendant argues that the proper merger of the offenses was to merge the greater offense into the lesser offense, rather than allowing the greater offense to stand as the trial court did in this case. However, he cites to no specific authority that merger of the lesser offense into the greater offense is improper based upon double jeopardy principles. We agree with the State that the trial court properly merged the reckless homicide into the second degree murder conviction. See State v. Banes, 874 S.W.2d 73, 81 (Tenn. Crim. App. 1993) (Under the merger concept, the lesser conviction merges with the greater offense resulting in one judgment of conviction); see also State v. Mila Love, No. W1999-01957-CCA-R3-CD, 2001 WL 935340, at *7 (Tenn. Crim. App. Aug. 17, 2001) (merging a defendant's reckless homicide convictions with her felony murder convictions); State v. Jermuriel Camacho Gillispie, No. W1998-00512-CCA-R3-CD, 1999 WL 1532151, at *3 (Tenn. Crim. App. Dec. 20, 1999) (merging a defendant's convictions for second degree murder with the defendant's felony murder convictions). Moreover, even if our ruling is determined to be incorrect as to the applicability of the mutually exclusive doctrine in the State of Tennessee, the remedy for such an error is a new trial, not a merger of the greater offense into the lesser offense as the Defendant suggests. See Jackson, 577 S.E.2d at 575-76 (citations omitted). The Defendant is not entitled to relief on this issue

*III. Hearsay Evidence and the Sixth Amendment*

Next, the Defendant contends that the trial court erred in allowing, as substantive evidence, the preliminary hearing testimony of Jarcquise Spencer and the pretrial statement Spencer made to the police. Spencer was fifteen years old at the time of trial and ten years old at the time of the shooting. When questioned at trial, Spencer could not recall the events surrounding the shooting, his testimony at the preliminary hearing, or making a statement to the police.

---

[9] As a part of the jury instructions, the trial court gave the following as to unanimity in this case:

> The crime charged in each count of the indictment is a separate and distinct offense. You must decide each charge separately on the evidence and the law applicable to it. [T]he Defendants may be found guilty or not guilty of any or all of the offenses charged. Your finding as to each crime charged must be stated in your verdict.

See T.P.I.—Crim. 41.03 ("Multiple counts: Finding on each required"). Although the Pattern Jury Instructions do not have the force of law, our trial courts "frequently use them as a source for jury instructions." State v. Rutherford, 876 S.W.2d 118, 120 (Tenn. Crim. App. 1993).

Prior to Spencer's testimony at trial, his mother expressed a desire to speak with the court because she was reluctant for her son to testify in this matter. She was permitted to do so and stated to the trial court that her son did not remember the events and that she "just [didn't] want him to testify."

The following day of trial, the State sought to call Spencer to the stand. Prior to doing so, the State requested to question Spencer at a jury-out hearing because Spencer had developed "a little bit of a memory loss in the last few days," and the prosecutor believed it was "intentional."

During questioning, Spencer testified that he could not recall the events surrounding the shooting and that he could not recall the substance of his testimony at the preliminary hearing.[10] Additionally, Spencer had no recollection of ever giving a statement to the police about the shooting. When he was shown a copy of the statement he made to the authorities, he recognized his handwriting and his signature on the document. Spencer said that he was in "regular classes" in the eighth grade, making mostly C's, and had no special needs. Spencer denied being a liar and stated that he did not lie to the police during the statement. Spencer confirmed that he understood the difference between telling the truth and a lie and stated that he was presently testifying truthfully. When asked the reason behind his faulty recollection, Spencer replied that he did not remember "because it happened so long ago[.]"

The prosecutor then asked Spencer if he remembered coming to his office two days earlier and recounting the events of the shooting. Spencer recalled speaking with the prosecutor but claimed that, at the meeting, he was only able to recount the events of November 9, 2006, after being shown his prior police statement. The prosecutor then responded:

> Sir, you told the story, just like you did at prelim, [sic] word for word, and then you and I sat down and talked about it again, word for word, and then I showed you those papers and said, "Do you remember coming down to 201 Poplar and testifying in front of Judge Pugh," and you read through it all, word for word, and your story didn't change one iota. What has happened in the last two days that you have total memory loss?

Spencer persisted that nothing had happened to him, that he simply did not remember. Another assistant district attorney general then stated that she was prepared to take the stand if necessary to testify about the events in the prosecution's office two days prior. The State

---

[10] At this time, the witness stated that he did recall the actual hearing, but he subsequently retracted that statement at trial.

opined that Spencer was faking his memory loss and asked the trial court if it wanted to hold Spencer or his mother in contempt.

Upon questioning by defense counsel, Spencer stated that there was no reason why he would have lied to the police back in 2006 and that there was no reason to cause him to lie at the present time. Spencer continued to deny any recollection about the shooting.

The trial court then took a short recess, allowing time for Spencer to review his preliminary hearing testimony and the police statement in an effort to refresh his recollection. After the recess, the trial court reviewed the statements with Spencer. Spencer confirmed that his handwriting, signature, and initials all appeared on his police statement. He further agreed that, attached to his statement, were several photographic displays with his signature and handwriting on them. Spencer confirmed that in one of the photographic displays, he identified the Defendant, writing, "Marlo, he pointed the gun at him, Quincy." Spencer said that he had reviewed most of the preliminary hearing transcript but that he still had no recollection of his testimony at the hearing or his police statement. The trial court inquired if Spencer was being threatened, and he replied in the negative.

Spencer was excused from the courtroom, and the trial court noted that Spencer appeared "reluctant" and opined, "I'm sure he remembers more than what he's saying . . . ." The trial court later agreed that Spencer was "lying about his memory[.]" Defense counsel pointed out that Spencer was not demonstrating a "lack of memory" but rather a "lack of being able to tell the truth." The State joined in this assessment that Spencer was not telling the truth. Defense counsel also noted that there were "Crawford issues with the ability to cross-examine" Spencer. The trial court replied, "You'll have full ability to cross-examine him."

The court then heard testimony from Sgt. Anthony Mullins, the officer who took Spencer's statement, in effort to determine the reliability of the statements. Sgt. Mullins recalled interviewing the ten-year-old Spencer several days after the shooting; Spencer's mother was present during the interview. Both Spencer and his mother signed the statement. Sgt. Mullins spoke with Spencer at two different times, once at Spencer's grandmother's house and once at the police station. Sgt. Mullins said that Spencer appeared "fine" during the statement, like a normal ten-year-old kid. Sgt. Mullins recalled asking Spencer for the truth. Spencer was provided with a sketch of the area, and according to Sgt. Mullins, he was able to mark where the different participants were located when the crime occurred. Sgt. Mullins also reviewed the "Advice to Witness Viewing Photographic Display" form signed by Spencer and the subsequent photographic displays with handwritten answers by Spencer. Sgt. Mullins admitted that Spencer's grandmother had been shown the same displays the day before they were shown to Spencer.

The trial court found that the requirements of Tennessee Rule of Evidence 803(26) ("Prior Inconsistent Statement of a Testifying Witness") were satisfied. The trial court ruled that Spencer's statements would be admitted as substantive evidence, observing that "it's pretty clear that what we have is a witness who's become reluctant for whatever reason, . . . probably fear." The trial court admitted Spencer's police statement, along with the photographic displays and diagram, under the exceptions to the hearsay rule contained in Rules 803(5) ("Recorded Recollection") and 803(26), of the Tennessee Rules of Evidence.[11] The trial court ruled that Spencer's preliminary hearing testimony was an exception to the hearsay rule under Rules 803(26) and 804(b)(1) ("Former Testimony" by an unavailable declarant).

Defense counsel then lodged an additional objection with the court regarding Rule 804(b)(1), that the preliminary hearing did not adequately provide a similar opportunity or motive for cross-examination of Spencer by the Defendants. The trial court determined the objection to be without merit. The trial court also noted the previously raised confrontation issue, concluding that there was "no confrontation violation with prior recollection recorded . . . based on the concept that [the defense was] going to have the ability to cross-examine him[.]"

When Spencer was called to the stand at trial, he recalled only minimal events from November 9, 2006, and did not remember speaking with the police or his testimony at the preliminary hearing in their entirety. He was questioned extensively regarding his memory of the events.

On appeal, the Defendant argues that the statements were inadmissible hearsay, and their admission as substantive evidence violated his Sixth Amendment right to confront the witnesses against him. The State contends that the trial court properly admitted the statements as exceptions to the hearsay rule or, alternatively, that any error in their admission was harmless.

The Tennessee Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is not admissible unless an exception to the hearsay rule applies. Tenn. R. Evid. 802.

---

[11] The trial court noted the difference between the two rules as follows:

> It comes in as substantive proof if it's 803(26) or if it's 803(5). The only difference between 803(5) and (26) is 803(5), the requirement is simply to have the statement read into the record. You cannot make it an exhibit. If it's 803(26), I think we can make it an exhibit.

Because the trial court found that both of the statements were admissible as substantive evidence under Tennessee Rule of Evidence 803(26), and allowed the statements to entered as exhibits in the record, we will begin by addressing that exception to the hearsay rule. Rule 803(26) provides a hearsay exception for a testifying witness's prior inconsistent statement. The statement is admissible as substantive evidence if the following conditions are satisfied:

1. The statement must be admissible under Tennessee Rule of Evidence 613(b).
2. The declarant must testify at the trial or hearing and be subject to cross-examination about the statement.
3. The statement must be audio or video recorded, written and signed by the witness, or given under oath.
4. The trial court must conduct a jury-out hearing to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

Tenn. R. Evid. 803(26) & Advisory Comm'n Cmts. Tennessee Rule of Evidence 613(b) provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require."

The Defendant argues that "memory loss, or the feigning of memory loss[,]" is the absence of a statement, rather than being inconsistent with Spencer's prior statements, as determined by the trial court. The 2009 Advisory Commission Comments to section 803(26) provide that this exception to the hearsay rule was adopted "to address circumstances where witnesses suddenly claim a lack of memory in light of external threats of violence which cannot be directly attributed to a party, for example." This is exactly the situation here. The Rule further provides that, if the prior statement is not recorded, it may be in written form, created by the witness or by another, but then must be signed by the witness; this covers Spencer's signed statement given to Sgt. Mullins, along with the accompanying photographic displays and diagram. Additionally, Rule 803(26) permits admission of a prior statement given under oath, which includes Spencer's preliminary hearing testimony.

At trial, Spencer was afforded the opportunity to explain or deny his prior statements, satisfying Rule 613. He was also subjected to cross-examination. Prior to Spencer's testimony, the trial court held a jury-out hearing and determined that the prior statements were made under circumstances indicating trustworthiness. All of the conditions of Rule 803(26) were met. Therefore, the trial court allowed Spencer's prior inconsistent statements

to be admitted as substantive evidence. See State v. Martin, 964 S.W.2d 564, 567 (Tenn. 1998); State v. Kendricks, 947 S.W.2d 875, 881 (Tenn. Crim. App. 1996). The trial court did not err in admitting the statements as substantive evidence. See State v. Michael Wayne Davis, M2010-02108-CCA-R3-CD, 2013 WL 105172, at *9 (Tenn. Crim. App. Jan. 9. 2013), perm. app. filed, (Tenn. Feb. 4, 2013); State v. Charles Jackson, No. W2010-01133-CCA-R3-CD, 2012 WL 543047, at *9-11 (Tenn. Crim. App. Feb. 17, 2012), perm. app. denied, (Tenn. June 22, 2012).

The trial court also admitted Spencer's signed police statement under the recorded recollection exception to the hearsay rule, Tennessee Rule of Evidence 803(5),[12] and Spencer's preliminary hearing testimony under the former testimony by an unavailable witness exception, Tennessee Rule of Evidence 804.[13] As noted by the trial court, the admission under these rules is not exactly akin to 803(26), which permits the evidence to be admitted as an exhibit into the record; Rule 803(5) and 804 would permit only the recorded recollection to be read into the record. Moreover, the Defendant's argument against admission under these two Rules is similar to his Rule 803(26) argument, i.e., he is challenging the trial court's conclusion that feigning memory loss is equivalent to lacking sufficient recollection for purposes of Rule 803(5) and to being unavailable as required by Rule 804(a). As we concluded in our previous analysis, this is a tedious distinction with little merit. Because the trial court admitted the statements as exhibits at trial under Rule 803(26),

---

[12] The recorded recollection exception provides as follows:

> A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness's memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

Tenn. R. Evid. 803(5).

[13] According to the Rules of Evidence, the former testimony of a declarant who is unavailable as a witness is admissible. Tenn. R. Evid. 804(b)(1). Unavailability can be satisfied in several ways, including if the declarant demonstrated a lack of memory of the subject matter of the declarant's statement. Tenn. R. Evid. 804(a)(3). As relevant to this case, the Rules of Evidence define former testimony as "[t]estimony given as a witness at another hearing of the same or different proceeding . . . if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination." Tenn. R. Evid. 804(b)(1). "Memory lapse, if demonstrated to the trial judge under [Tennessee] Rule [of Evidence] 104(a), is enough to get the contents of recorded recollection read to the jury, and the same condition should be enough to get cross-examining sworn former testimony before the jury." Tenn. R. Evid. 804(b)(3), Advisory Comm'n Cmts. (1994).

and we have determined that the trial court did not err in that determination, we decline to address these additional findings of the trial court further.

The Defendant also contends that the admission of these statements violated his confrontation rights. Because Spencer was present, testified at trial, and was subject to cross-examination, the admission of his statements did not rise to the level of constitutional deprivation. See United States v. Owens, 484 U.S. 554, 559 (1998) (holding that a lack of memory does not render a witness unavailable for purposes of the Confrontation Clause); see also State v. Brandon Ackerman, No. M2010-01979-CCA-R3-CD, 2012 WL 2870568, at *17 (Tenn. Crim. App. July 13, 2012) ("Crawford and its progeny are limited to those situations when the State offers into evidence the out-of-court statements of a non-testifying declarant.") (citing Crawford v. Washington, 541 U.S. 36, 59 (2004)).

*IV. Sentencing*

The Defendant challenges the trial court's imposition of the maximum sentence of forty years based "on facts not found by the jury." The Defendant was a Range II, multiple offender who was convicted of second degree murder, a Class A felony; therefore, he was subject to a sentence between twenty-five and forty years. See Tenn. Code Ann. § 40-35-112(b)(1). The trial court enhanced the Defendant's sentences to the maximum within the range. The trial court found that three enhancement factors applied[14]: (1) the Defendant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; (2) the Defendant was a leader in the commission of a crime involving two or more criminal actors; and (9) the Defendant possessed or employed a firearm during the commission of the offense. See Tenn. Code Ann. § 40-35-114 (1), (2), & (9). The trial court did not find any evidence in mitigation. See Tenn. Code Ann. § 40-35-113.

The Defendant's sole contention with regard to the sentence imposed by the trial court was that his sentence was imposed in violation of his constitutional right to a trial by jury, as recognized in Blakely v. Washington, 542 U.S. 296 (2004) to a jury trial. In State v. Cross, 362 S.W.3d 512 (Tenn. 2012), our supreme court aptly stated,

---

[14] In his brief, the Defendant submits that "the trial court held against [him] the fact he declined to provide a statement in the presentence interview"; that "the court considered as an enhancement element the Defendant's failure to comment on his remorse or responsibility"; and that "the trial court erred by enhancing [his] sentence based upon its belief the crime was actually felony murder." While the trial court did make these observations in rendering its sentence, it did so in addition to its consideration of the three applicable enhancement factors found. Of the enhancement factors applied, the Defendant challenges only the application of factor (9) on appeal under Blakely.

[the defendant] fails to acknowledge or address the various decisions in which this Court has addressed the 2005 amendments to Tennessee's sentencing provisions. This Court has held repeatedly that the 2005 amendments resolved the Sixth Amendment constitutional concerns addressed in Blakely v.Washington that arise when trial courts rely on enhancement factors that have not been found by a jury.

362 S.W.3d at 528 (citing State v. Hester, 324 S.W.3d 1, 69 (Tenn. 2010); State v. Banks, 271 S.W.3d 90, 144-45 (Tenn. 2008); State v. Carter, 254 S.W.3d 335, 342-44 (Tenn. 2007)). The court continued:

Prior to being amended in 2005, Tennessee's sentencing laws set presumptive sentences in non-capital cases. The midpoint of the sentencing range was the presumptive sentence for all Class A felonies and the statutory minimum sentence was the presumptive sentence for all other felonies. Under the prior sentencing scheme, a trial court could not increase a defendant's sentence beyond the presumptive sentence in the absence of an enhancement factor. However, a trial court could increase the sentence to the maximum within the range if it found even a single enhancement factor.

In response to constitutional concerns arising from the United States Supreme Court's Blakely v. Washington decision, the General Assembly amended Tennessee's sentencing statutes to remove presumptive sentences. These changes to the sentencing structure "enabled Tennessee's trial courts to sentence a defendant to any sentence within the applicable range as long as the length of the sentence is 'consistent with the purposes and principles' of the sentencing statutes." The 2005 amendments to Tennessee's sentencing laws have plainly "increase[d] the amount of discretion a trial court exercises when imposing a sentencing term." These changes also eliminated the Blakely constitutional concern with Tennessee trial courts finding the facts necessary to apply enhancement factors. Thus, we find [the defendant's] argument based on Blakely v. Washington to be unavailing.

Id. at 528-29 (internal citations omitted).

Likewise, the Defendant in the instant case fails to recognize that the sentencing arguments previously cognizable under Blakely v. Washington were rendered moot by the 2005 Amendments to the Sentencing Reform Act of 1989. The trial court did not err in enhancing the Defendant's sentence to forty years based on the existence of three enhancement factors not found by a jury.

*V. Cumulative Error*

Finally, the Defendant complains that the cumulative effect of the errors at trial "resulted in prejudicial error" depriving him of a fair trial. However, because this court has found no error in the rulings of the trial court, cumulative error does not provide the Defendant with a basis for relief.

## CONCLUSION

In sum, we conclude that the evidence was sufficient to sustain the Defendant's convictions and that the trial court did not err in its sentencing determination. The Defendant's additional issues are likewise without merit. Accordingly, we affirm the judgment of the trial court.

_____
D. KELLY THOMAS, JR., JUDGE